SAVOIE, Judge.
This is a tort action. Plaintiff, Richard Lewis, filed suit against defendants, State of Louisiana, through the Department of Highways; City of Baton Rouge; and Parish of East Baton Rouge. The City and Parish were dismissed on an exception of no cause of action. The case went to trial against the remaining defendant, State of Louisiana, through the Department of Highways and Transportation (currently Department of Transportation and Development, which shall be referred to as DOTD). The trial judge found in favor of the defendant, and plaintiff now appeals.
This suit arises out of the following facts. Plaintiff Lewis was riding a motorcycle on Interstate 12 in the city of Baton Rouge at about 9:00 p.m. on Friday, July 22, 1977. Lewis was heading in a westbound direction on the interstate in the right lane. He changed lanes to pass a car being driven in the right lane by James Lawn, and then returned to the right lane. Plaintiff was traveling at 55-60 m.p.h. As Lewis approached the 1-12 interchange with Drusilla, he felt a jolt and his motorcycle began shaking violently. He tried to control the motorcycle; unable to do so, he went off,the road and struck a breakaway light pole. He sustained serious injuries to his right leg.
Plaintiff filed suit alleging that the interstate was defective, causing his accident. Plaintiff alleged that the defect was a hole in an expansion joint. DOTD is responsible for that section of the interstate where plaintiff’s accident occurred. Plaintiff contended that defendant was liable under LSA-C.C. arts. 2315 and 2317.
The case was tried on January 16, 1986. The trial court found in favor of defendant. In his oral reasons for judgment, the trial judge questioned whether plaintiff had proved the existence of a defect in the interstate at the time of the accident. He then assumed that the interstate was defective in order to .determine the issue of liability. Under LSA-C.C. art. 2315, the judge found that DOTD was not negligent because plaintiff did not prove that DOTD had actual or constructive knowledge of the defect. Under LSA-C.C. art. 2317, he assumed liability but found that plaintiff was contributorily negligent, a form of victim fault which is a defense to LSA-C.C. art. 2317 strict liability. Plaintiff’s contributory negligence bars him from any recovery since the accident occurred prior to the adoption of comparative negligence.
The plaintiff raises three assignments of error:
1. the trial court committed manifest error in attributing plaintiff-appellant’s injuries and damages to his own contributory negligence when by a preponderance of the evidence plaintiff-appellant proved that the sole and proximate cause of injuries was the defective condition of the roadway under the custody and control of defendant-appellee.
2. The trial court committed manifest error in failing to accord the testimony of plaintiff-appellant’s expert witnesses the full weight that it deserved.
3. The trial court erred in ruling from the bench less than two hours after the *712 close of testimony since the Court was asked to consider the technical testimony of three expert witnesses, deposition testimony and additionally had to rule on such complicated legal issues as the relationship of the State of Louisiana to plaintiff-appellant and the accident sued upon under pre-1980 law.
Plaintiffs assignments of error basically present this court with one issue: whether the trial court’s findings are manifestly erroneous.
Plaintiff does not contest the trial court’s ruling that the defendant was not liable under LSA-C.C. art. 2315. Thus, we must examine the trial court’s findings under LSA-C.C. art. 2317. In order to recover under LSA-C.C. art. 2317, the plaintiff must prove that the thing which caused the damage was in the care, custody, or control of the defendant, that the thing contained a vice or defect, and that plaintiff’s damages were due to the vice or defect. Loescher v. Parr, 324 So.2d 441 (La.1975). One defense to 2317 strict liability is victim fault, which includes contributory negligence.
The only evidence showing the alleged defect is a photograph of the expansion joint containing a hole or rut taken by plaintiff approximately one month after the accident. An expansion joint is a space between concrete slabs to allow for the expansion of the concrete in hot weather; expansion joints are usually filled with some substance. All the experts based their testimony upon this photograph because they did not become involved in the case until 1984, by which time the expansion joint had been repaired. The plaintiff did not actually see the hole in the expansion joint at the time of the accident; he only saw the expansion joint and felt a jolt as he passed over it, whereupon his motorcycle began shaking. Although plaintiff did not see the hole in the expansion joint, he told police officers at the scene that he had hit a hole in the road. The driver of the car immediately following plaintiff, James Lawn, who witnessed the accident, testified that he did not see or feel any hole or bump when passing over the expansion joint.
Defendant contends that plaintiff did not prove that the photograph of the expansion joint taken on August 29, 1977, was representative of the condition of the joint on July 22, 1977. Defendant’s expert, Dr. Olin Dart, testified that the filler material placed within this expansion joint was probably a polyurethane foam. Dr. Dart testified that due to weather, pressure from the concrete, and traffic action, filler material deteriorates. Dr. Dart testified that it was possible that the level of deterioration as shown in plaintiff’s August 29th photograph could have started within a few days prior to the taking of the picture. However, in the same sentence, he said, “it could have been going on for a long time, probably — possibly before the — accident.” (Emphasis added).
Plaintiff's photograph shows a wide expansion joint. In the middle of the expansion joint, pieces of filler material appear to be missing; the remainder of the material is compressed deeply into the joint, creating a hole or rut within the joint. The cement is chipped away on one side of the joint, further enlarging the rut or hole. From this photograph it appears that this rut or hole did not develop in a short time; thus, we find that plaintiff's photograph fairly depicts the condition of the road as it existed at the time of the accident.
The plaintiff's expert witnesses did not testify as to the size or depth of the hole; both of plaintiff’s expert witnesses testified that expansion joints were not normally as wide as this one. Based on the photograph, the plaintiff’s expert witness, Duaine Evans, testified that in his opinion, this hole would pose a “serious problem” for any two wheel vehicle such as a motorcycle; the hole would not present any hazard to a four wheel vehicle. Mr. Evans opined that the hole was an emergency situation requiring immediate repair. He further testified that some motorcycles may have no problem traversing the hole while others could possibly go out of control, depending upon how the motorcycle hit the hole, what part of the hole the motorcycle hit, the individual motorcycle, and the individual driver.
*713 Plaintiff’s other expert witness, Alvin Doyle, Jr., testified that he had never seen an expansion joint as big as the one plaintiff had traversed. Mr. Doyle testified that depending on how the motorcycle hit the hole, the encounter could cause it to go out of control. In his opinion, he felt that more likely than not, the hole caused the plaintiffs motorcycle to go out of control.
Defendant’s expert, Dr. Olin Dart, testified that based on the picture, the distance between the two slabs of concrete was about 4 or 5 inches, and that the chipped concrete, which he called spalling, also occupied 4-5 inches. Dr. Dart said that the chipping was not very deep, and that there would be no great effect on a motorcycle while crossing the joint. However, plaintiff on cross examination questioned Dr. Dart as to his ability to form that opinion based upon his familiarity with the operation of motorcycles; Dr. Dart admitted that he had no training or personal experience in the operational characteristics of motorcycles.
We find that based upon the testimony, the hole in the expansion joint was unreasonably dangerous to motorcyclists, and constituted a defect. The fact that the vehicle immediately behind plaintiff traversed the expansion joint with no problem is of no moment because as the experts testified, the hole posed no problem to four wheel vehicles, only two wheel vehicles.
We must now determine whether the damages to plaintiff were caused by the defect or by his own contributory negligence. The trial court found that plaintiff was contributorily negligent. The judge based his finding on the testimony of both plaintiff’s and defendant’s experts that the expansion joint was 537 feet from the light pole that plaintiff hit. Dr. Dart testified that traveling at 60 miles per hour, the plaintiff could have brought the vehicle to a stop with controlled braking within 462 feet. Because plaintiff had enough distance to bring his motorcycle to a controlled stop and failed to do so, the judge found him contributorily negligent.
The plaintiff described the accident in the following manner:
[A]s soon as I came into the middle of the road the motorcycle started shaking violently. I tried to maintain control. The slower I got, the worse the shaking and the vibration got. I was trying to veer it off on the right-hand side of the road to get in the grass and possibly lay . it down and slide it to prevent serious injury to myself....
Plaintiff testified that a sudden jolt caused the motorcycle to vibrate; the jolt was caused when he hit the hole in the expansion joint. Although the plaintiff saw the expansion joint before crossing it, he did not see the hole in the joint and thus saw no need to take any evasive action prior to crossing the expansion joint. As plaintiff frequently rode trail bikes through the woods, defense counsel tried to liken crossing over the hole to crossing a log on a trail bike. However, plaintiff’s expert Dr. Doyle said that on a trail bike, the operator’s speed is very low and that he keeps his stability with both feet on the ground.
On cross examination, plaintiff described the accident in further detail:
QUESTION: After you struck the crack or hole or whatever, your bike began to shake, I believe you said; is that correct?
ANSWER: Yes.
QUESTION: All right. And you immediately slowed: is that right?
ANSWER: The more I slowed, the more it shook.
QUESTION: So what did you do in that case; did you not slow?
ANSWER: Well, I tried to maintain the speed for a while and see if the shaking would stop.
QUESTION: Am I correct, then, for a while you were in control of the motorcycle?
ANSWER: I was trying to maintain control.
QUESTION: All right. During the point where you were trying to slow and then discovering that it got worse when you slowed, would you then speed up a little bit?
ANSWER: I tried to.
*714 Defense counsel then recapitulated plaintiffs previous testimony.
QUESTION: And so am I correct, then, that you struck the hole; it began to shake. You slowed; that made it worse so you speeded up. And then what happened? What did you do then?
ANSWER: I had to slow back down. Speeding up for a second or two to try to lighten the front end, which is what you’ll do on a trail woods bike, and that didn’t help so I let off and tried to get off of the highway.
James Lawn, the driver of the car immediately behind plaintiff and an eyewitness to the accident, corroborated plaintiff’s testimony. Mr. Lawn testified that plaintiff’s motorcycle was shimmying and shaking. According to Mr. Lawn, “the entirety of the bike started shaking — if we use shimmy or fishtailing or whatever.... It was a very strong or rapid vibration.” He then saw plaintiff veer off to the right and onto the shoulder. Mr. Lawn also stated that he saw plaintiff's brake lights come on and that the plaintiff did slow down some.
The testimony of Mr. Doyle, the only expert as to the effect of pavement defects on motorcycles, is consistent with plaintiff’s recounting of the accident insofar as the effect of the hole on plaintiff’s motorcycle. Mr. Doyle was the only expert who had training and personal experience with motorcycles. Mr. Doyle based his testimony upon his training, his personal experiences as a motorcycle rider, and his own involvement in similar accidents. He testified that the hole in the interstate would cause the front wheel of the motorcycle first to go down and then to rebound. On the rebound, the bike would start to shimmy or wobble. The front of the bike would go in one direction and the rear in the other. Mr. Doyle also testified that if the bike was at an angle when it crossed the hole, this would only exacerbate the situation.
On cross examination, Mr. Doyle testified that the effect of hitting this hole in the interstate would be similar to having a flat tire on the front wheel of the motorcycle, something which had happened to Mr. Doyle. Mr. Doyle stated that with a flat tire, the operator loses his steering ability and that the more he slows down, “the worse the oscillations and vibrations get. That is the bad part. You’ve got to stop sooner or later.”
The trial court based its finding that plaintiff was contributorily negligent upon the testimony of Dr. Dart, defendant’s expert, particularly that dealing with stopping distances. Yet, Dr. Dart testified that he had never operated a motorcycle nor had he ever studied the operating characteristics of motorcycles. Dr. Dart’s testimony was that a wheel crossing the hole in the expansion joint would hardly get in the crack and that all that would be felt was a pronounced thump. In questioning Dr. Dart about motorcycles, defense counsel asked Dr. Dart whether an increase in speed would reduce the vibrations of a motorcycle which was shimmying and shaking. Dr. Dart did not know. When asked if crossing the hole at an angle would cause any difficulty, Dr. Dart testified he thought that a slight angle would not result in a problem. Yet this is in direct conflict with Mr. Doyle’s testimony, wherein he said that “a number of things could happen if this vehicle passed over this particular point at the slightest an-gle_ If he was the slightest bit banking, like once you pass a car and returning back up straight, or any of those things, he could be in trouble.” Likewise, Mr. Evans also testified that even a small angle would have some effect on the steering.
Dr. Dart gave the stopping distances for various speeds. Yet it is not clear whether these stopping distances were based on those for four wheel vehicles or for two wheel vehicles. Plaintiff’s counsel questioned Dr. Dart as follows:
QUESTION: Now, you testified — you gave an opinion regarding various speeds and stopping distances and so on, of motorcycles. Were you referring to motorcycles?
ANSWER: Well, this is just what I think a motorcycle would be capable of doing. If they wanted to use a normal *715 rate of deceleration, then that would— the distances I gave you would hold; yes.
QUESTION: But you have no training or experience involving the operational characteristics of motorcycles?
ANSWER: Oh, I’ve conducted stopping tests using a driver, an operator, in actually determining the stopping distances from various speeds.
Dr. Dart was asked what effect the vibrations or oscillations of a motorcycle would have on these distances. He testified that if the vehicle was “out of control, the stopping distances would not be as accurate.” From plaintiffs testimony, it is clear that his motorcycle was out of control due to the vibrations and oscillations; thus, the stopping distances given by Dr. Dart, which did not take into account these factors, should not be controlling.
We find the testimony of Mr. Doyle, the only expert witness as to motorcycle operations, to be of greater weight than that of Dr. Dart, who was unfamiliar with motorcycles. The difficulty of regaining control of a motorcycle after it strikes a hole is such that we can not use the mathematical figures given by Dr. Dart to determine the distance in which plaintiff should have stopped.
The risk of a motorcyclist losing control after striking this hole also encompasses the risk of the motorcyclist failing to regain control. Plaintiff was an experienced motorcyclist traveling on the interstate in a safe manner. He saw an expansion joint in the road, but did not see the hole or rut in the expansion joint. Based on what he had seen, he felt no need to take any evasive action. Upon crossing the expansion joint, his motorcycle was suddenly jolted out of control. Plaintiff tried in different ways to regain control of his motorcycle, but was unsuccessful in overcoming the effect of the hole in the expansion joint. We find that the trial court’s ruling that plaintiff’s actions constituted contributory negligence is manifestly erroneous; the plaintiff has proved the defendant’s liability under LSA-C.C. art. 2317.
Although we find plaintiff entitled to recovery, we find the record incomplete as to quantum. For this reason, we remand to the trial court for a determination of the award. Costs to be assessed against appel-lee.
REVERSED AND REMANDED.